CAFETEROS DE PUERTO RICO, Plaintiff and Appellant, *v.* SECRETARY OF THE TREASURY, Defendant and Appellee.

No. 12050. Submitted March 4, 1959.—Decided May 16, 1961.

*Erasto Arjona Siaca* for appellant. *J. B. Fernández Badillo, Secretary of Justice, Arturo Estrella, Assistant Secretary of Justice,* and *Carlos G. Látimer, Assistant Attorney General,* for appellee.

MR. JUSTICE BLANCO LUGO delivered the opinion of the Court.

As part of a relief program for the coffee industry in Puerto Rico, the Legislative Assembly of Puerto Rico approved within the years 1935 to 1940 a number of acts to regulate the sale of said product,[1] to provide for a survey of the coffee problem,[2] to fix its selling price and production quotas,[3] and to levy a special tax or excise for the purpose of creating a fund for the promotion of the local coffee market.[4] Act No. 255 of May 15, 1938 authorized the Commissioner of Agriculture to fix the price of the raw coffee received by the producer within a minimum of eighteen cents and a maximum of twenty-two cents per pound. The minimum price fixed for the year 1938–39 was $20.00 per hundredweight. At this time Act No. 116 of May 15, 1936 was in force and it provided for a tax of ¼ cent on each pound of coffee sold in Puerto Rico. Act No. 145 of May 11, 1939 levied a special tax of one and one-half cents on each pound of raw coffee sold for local consumption and it expressly provided that "the minimum price which the Commissioner

---

[1] Act No. 3 of July 11, 1935 (Spec. Sess. Laws, p. 46), amended by Acts No. 248 of May 15, 1938 (Sess. Laws, p. 468) and No. 111 of May 1, 1940 (Sess. Laws, p. 678).

[2] Act No. 65 of May 4, 1938 (Sess. Laws, p. 176).

[3] Act No. 255 of May 15, 1938 (Sess. Laws, p. 480), amended by Acts No. 124 of May 6, 1939 (Sess. Laws, p. 642), No. 112 of May 1, 1940 (Sess. Laws, p. 694), and No. 131 of May 2, 1940 (Sess. Laws, p. 752).

[4] Act No. 145 of May 11, 1939 (Sess. Laws, p. 702), amended by Acts No. 13 of June 3, 1939 (Spec. Sess. Laws, p. 38) and No. 157 of May 8, 1940 (Sess. Laws, p. 932). This Act No. 145 repealed Act No. 116 of May 15, 1936 (Sess. Laws, p. 678).

of Agriculture and Commerce shall fix pursuant to the provisions of Act No. 255 of 1938 *shall be increased by the amount of the tax hereinabove levied*".[5] This provision was in harmony with Act No. 124 of May 6, 1939, which amended Act No. 255 of 1938 and which with regard to the fixing of the coffee price added a provision to the effect that "the Commisioner of Agriculture and Commerce shall be empowered to fix the reselling price of unprocessed hulled coffee, which in no case shall be less than the price paid to the producer, *plus the amount of the taxes in force on coffee.*" For the year 1939–40 a minimum price of $18.50 per hundredweight of coffee was fixed which added to the excise of $1.50 per hundredweight made a total of $20.00.[6] By virtue of the afore-cited acts, every purchaser, handler, and dealer of raw coffee was bound to pay a price not less than the one fixed by the Commissioner (section 3).

Cafeteros de Puerto Rico is a cooperative association of coffee growers which at the time of the effectiveness of Act No. 145 of 1939 which levied a special tax of one and one-half cents on every pound of raw coffee sold, held in its possession coffee of the 1938–39 crop. Since there was doubt as to the application of the new act to the coffee in possession of the cooperative, an administrative declaration was obtained on this point and to that effect, by a circular letter of August 21, 1939, the then Treasurer of Puerto Rico explained that the new act applied only to coffee produced in the 1939–40 crop and succeeding years and that the coffee of preceding crops would only pay the tax of one-fourth of a cent per pound as provided by Act No. 116 of 1936.

---

[5] This act went into effect on August 9, 1939 because it was not approved by two-thirds of the members elected to each House in the Legislature.

[6] The information on the minimum prices fixed by the Secretary of Agriculture was taken from the Annual Report of the Secretary of Agriculture and Commerce to the Governor of Puerto Rico, Fiscal Year 1939–40, pp. 116–117.

Of the 1938–39 crop there were sold in the local market 3,857,052.91 pounds of coffee, of which 886,527.91 pounds were sold prior to the effectiveness of Act No. 145 of 1939, and 2,970.525 pounds after said date. The cooperative association paid the excise on the whole crop at the rate of one-fourth of a cent per pound and by virtue thereof made two payments of $4,644.05 and $4,815.22, on November 11, 1939 and February 27, 1940,[7] that is, a total amount of $9,459.27.

On May 19, 1942 a new Treasurer requested the appellant to pay the sum of $37,314.93 which represents the difference between the excise of one and one-half cents and that of one-fourth of a cent computed on 2,970.525 pounds of coffee which although produced in the 1938–39 crop were sold subsequently to the effectiveness of Act No. 145 of 1939 which had increased the tax on the basis of the minimum price which the Commissioner of Agriculture fixed for 1939–40. In order to avoid the payment of this sum and the accrued interest thereon the cooperative association went to court and filed a complaint which it labelled as an action for the nullity of tax collection, which was finally dismissed. *Cafeteros de Puerto Rico v. Treasurer*, 74 P.R.R. 704 (1953).

In view of this situation the appellant paid the excise and interest under protest on June 12, 1953, and after exhausting the administrative proceeding, it filed the present action requesting reimbursement thereof. In this action

---

[7] The appellant insists in its brief that the expression contained in the opinion rendered by this Court in *Cafeteros de Puerto Rico v. Treasurer*, 74 P.R.R. 704, 707–8 (1953), to the effect that "On November 17, 1939, and on February 27, 1940, the appellant sold the coffee of the 1938–39 crop deducting and withholding from the selling price the amount of the tax of one-fourth of a cent per pound, which it paid to the Treasurer. . . . . ", constitutes the law of the case. Irrespective of the fact that this pronouncement was unnecessary for the purposes of the conclusion reached in said suit, which was decided *exclusively* on the ground that the remedy of injunction was improper to prevent the collection of a tax, the truth is that the evidence in the present case merely shows that on the date mentioned the excise was paid but not that the coffee was sold.

plaintiff substantially makes the same allegations as it did in the previous complaint as to the improper payment of the excises. See *Cafeteros de Puerto Rico* v. *Treasurer, supra,* particularly at 710–11. The Secretary of the Treasury requested the dismissal of the complaint on the ground that the court lacked jurisdiction to take cognizance of the case "inasmuch as from the face of the complaint it does not appear nor is it expressly alleged that the plaintiff has suffered the burden of the payment of the tax whose refund it requests", and because it does not state facts constituting a cause of action. This petition of dismissal was denied.[8] The defendant answered and in his answer he reproduced as special defense the lack of jurisdiction on the above-stated ground.

The case went to trial. The plaintiff association offered documentary evidence which consisted of: (1) a statement showing the coffee of the 1938–39 crop sold during the effectiveness of Acts Nos. 116 of 1936, 145 of 1939 and 157 of 1940; (2) four invoices of excise tax payments; (3) copy of a circular letter of 1939; (4) a certificate issued by the Auditor of Puerto Rico at that time as to the final balance of the account of "Puerto Rican Coffee Price Stabilizing Commission"; (5) a notice addressed to the coffee growers

---

[8] The order isued reads as follows:

"With respect to the first ground, that is, the lack of jurisdiction, it is unquestionable that, as alleged by the petitioner:

"1. In June 1953 it paid the excises the refund of which is claimed.

"2. It is a cooperative association of farmers and coffee growers, which acted as depositary of this product. It was engaged in receiving, depositing and conditioning said coffee for its distribution and subsequent sale. The coffee in question which has been taxed did not belong to the plaintiff.

"And if it *did not* belong *to the plaintiff,* the sale thereof could not involve the transfer of any surcharge on account of tax *not* collectible from plaintiff.

"We must conclude, therefore, that the tax the reimbursement of which is sought could not have been transferred, by it to anybody. We hereby decide that defendant's contention that this court lacks jurisdiction to take cognizance of the case is not correct."

by the Treasurer of Puerto Rico on July 22, 1939 published in the newspaper "El Día"; (6) a copy of a letter addressed by the Treasurer of Puerto Rico to the appellant on August 19, 1942 confirming his determination of demanding payment of excise taxes for the sum of $37,314.93; (7) copy of a motion for reconsideration dated September 20, 1946 filed by the appellant association; (8) copy of the invoice of June 12, 1953 requesting payment of excises for $37,314.93 plus interest for $24,634.07, that is, a total amount of $61,949.00, stating on the back thereof the grounds invoked by the association for making the payment under protest; (9) copy of the petition for refund; (10) copy of the order of the Secretary of the Treasury denying the refund; (11) copy of a demand of payment of June 3, 1953; (12) copy of the payment made under protest; and (13) copy of the testimony of Mr. Ramiro Colón, General Manager of the appellant, given on October 7, 1948 while the case in the action for nullity of tax collection was being heard in the District Court of San Juan. At the end of the introduction of this evidence the plaintiff asked leave to conform the pleadings to the evidence which, in its opinion, had established that the plaintiff had suffered the full burden of the payment under protest and had not transferred it to any other person. With the objection of the Secretary of the Treasury the trial court admitted the proposed amendment "without prejudice of and obviously reserving the right to deny it after hearing all the evidence and deciding the case on its merits." In a subsequent hearing the Secretary offered documentary evidence consisting of: (1) specific minutes of meetings of the Board of Directors of the cooperative; (2) copy of a regulation promulgated by the Treasurer on September 18, 1939; and (3) copy of a report on the investigation carried out by internal revenue agent Víctor Fragoso.

The Superior Court dismissed the complaint for lack of jurisdiction and said:

"To be vested with jurisdiction it is necessary that the plaintiff *prove* that it sustained *the burden* of the tax the reimbursement of which is sought herein, that is, that it did not transfer the payment of the tax to any person.

"Yet, the evidence introduced has not shown such a thing. On the other hand, it shows something which is entirely the opposite—that is, that Cafeteros de Puerto Rico, as agreed with the defendant, was to include in the selling price of the coffee to *its* members, and deliver to the Treasury, the excises which were levied, pursuant to the laws mentioned in this suit, to be paid by the true *purchasers* of that product.

"On January 8, 1954, when we dismissed defendant's motion requesting this Court to declare itself without jurisdiction to take cognizance of the action, no evidence had yet been introduced to the effect *that selling prices* of the coffee to be sold by Cafeteros de Puerto Rico were to include, and did include, the amount of the excises paid, or to be delivered to the Secretary of the Treasury." From this judgment an appeal was taken.

■■■ On June 12, 1953, when the excises were paid, as well as on October 11, 1953, when the claim for reimbursement was filed, the law provided that only the person bearing the burden of the tax may file an appeal for the review of a denial of reimbursement of any tax or excise; "and an allegation in this sense and the evidence thereof at the proper time, shall be considered as requirements for jurisdiction."[9]

---

[9] Act No. 235 of May 10, 1949 (Sess. Laws, p. 732, 13 L.P.R.A. § 281 *et seq.*), known as the Uniform Tax Procedure Act, provides in its § 2(6) that an appeal may be taken from a decision denying the reimbursement of any tax, "by filing complaint in the Tax Court. . . *in the manner provided for* by the act creating said Court . . ." and Act No. 328 of May 13, 1949 (Sess. Laws, p. 996) which reorganized said Court provided in § 2 that "In addition to the jurisdiction therein vested by special laws, the Tax Court of Puerto Rico shall have exclusive jurisdiction to take cognizance of all cases, actions and proceedings, or special or extraordinary remedies, in connection with, or affecting, the levy, collection and payment of all kinds of taxes, including property taxes, inheritance and gift taxes, income taxes, unfair profiteering taxes, social insurance taxes, excises, license taxes, and any other taxes or imposts, as well as to take cognizance of claims for taxes collected by unlawful procedure or which voluntarily, or without notice from the Treasurer of Puerto Rico were paid unduly or in excess, the reimbursement of which is authorized by law and is

The other jurisdictional requirement established in these cases refers to the term of thirty days from the date of mailing the notice of the Treasurer denying the petition for reimbursement.[10]

We recently stated in *Larroca* v. *Aboy, ante,* p. 478 (1961), that "It is a well-settled principle that ordinarily a judicial action requiring a decision as to whether or not a tax should be levied and collected or as to whether or not there exists the obligation to pay, is a suit against the sovereign and requires the consent of the State to be sued." These so-called "jurisdictional requirements" are nothing more than the expression of the conditions or requirements the fulfillment of which is required by the State in order to be sued. Therefore, they must be strictly complied with and in the manner required by the Legislature. *R. Santaella & Bros.* v. *Tax Court,* 66 P.R.R. 819 (1947).

The purpose of requiring that the action for reimbursement be filed by the person or entity actually bearing the burden of the tax is to prevent a person who did not pay the amount claimed from benefiting himself with any reimburse-

---

refused by the Treasurer of Puerto Rico; *Provided, however,* That this jurisdiction may not be pleaded before the court by any person until there has been a proper administrative decision in the matter on the part of the Treasurer of Puerto Rico in accordance with law; *And provided, further,* That only the person bearing the burden of the tax or excise at issue may take an appeal to the Tax Court of Puerto Rico for the review of a denial of reimbursement of any tax or excise; and an allegation in this sense, and the evidence thereof at the proper time, shall be considered as requirements for jurisdiction. ..." *Cf. Larroca* v. *Aboy, ante,* p. 478 (1961).

This jurisdictional requirement was probably established as a result of the final outcome of the reimbursement suit filed in *Puerto Rico Tobacco Corporation* v. *Buscaglia,* 62 P.R.R. 782 (1944). In said case refund was ordered of certain amounts paid by the plaintiff as excises levied on the sale of cigarettes and which the plaintiff had obviously transferred to the consumer, including them in the selling price of the article. *Cf. Pyramid Products* v. *Buscaglia,* 64 P.R.R. 788 (1945); *Axton Fisher Tobacco Co.* v. *Buscaglia, Treas.,* 65 P.R.R. 115 (1945).

[10] Section 2 (6) of Act No. 235 of May 10, 1949, *supra.* For a survey of the legislation on reimbursement of tax "unlawfully" collected, see *Gerardino* v. *Tax Court,* 68 P.R.R. 206 (1948).

ment that he may obtain. This is particularly true in the cases of excises in which, as a general rule, the tax is paid by the consumer as part of the selling price. The concern of the lawmaker on this matter becomes still more evident when considering Act No. 67 of May 7, 1945 (Sess. Laws, p. 248, 13 L.P.R.A. § 2231 *et seq.*), known as the "Unjust Enrichment Act", which levies a special income tax of eighty per cent on the net income derived from the reimbursement of excises, provided that the person to whom the reimbursement is made should have passed said excises to another person in the sale of the articles, either by including them in the selling price or otherwise. Subsequently, and in the cases where the Secretary of the Treasury administratively grants a refund or credit for taxes improperly paid, the Treasurer was required to give an administrative decision to the effect that the taxpayer had borne the burden of the tax. Act No. 232 of May 10, 1949 (Sess. Laws, p. 720, 13 L.P.R.A. § 261).

■ Pursuant to the facts stated above, the plaintiff Cafeteros de Puerto Rico did not allege in the complaint that it had borne the burden of the excises, the reimbursement of which is sought. However, at the hearing held on April 27, 1954 it requested that the pleadings be considered amended to that effect. The case was not definitively submitted until February 23, 1955. By that time the language of the Act which requires said allegation had already been modified to read "and a plea to such effect, together with proper supporting proof, shall be deemed requirements without compliance with which the Superior Court of Puerto Rico *shall not acquire jurisdiction to decide the case.*" Act No. 5 of October 5, 1954 (Sp. Sess. Laws, p. 42). It therefore follows that at the time the case was decided the plaintiff had already made the necessary plea. However, its claim must be dismissed because, in our opinion, it did not successfully *prove* that it sustained the burden of the tax. Let us see.

The documentary evidence presented by the plaintiff and which we listed above merely tends to prove that on June 12, 1953 it paid under protest the amount of the excises claimed by the Secretary of the Treasury, and that when it claimed the reimbursement within the statutory period of four years the same was denied. Since this evidence was obviously insufficient and since counsel for the Secretary of the Treasury insisted on the question of lack of jurisdiction, plaintiff offered and the Court admitted in evidence the testimony that Mr. Ramiro Colón had given on *October 7, 1948, when the excises had not yet been paid,* before the former District Court of San Juan in a suit in which the identical question of the improper payment of tax had been raised.

Insofar as pertinent to the question of whether appellant sustained the burden of the tax, the testimony of Mr. Colón may be summarized thus: He is the General Manager of the Cooperativa de Cafeteros de Puerto Rico and has been taking part since 1925 in the matters and business of this association; that the cooperative receives the coffee from the members as the depositary thereof and sells it in the market for the account of the latter; that upon the enactment of Act No. 145 of 1939, a bill which was promoted by the coffee growers themselves and which increased the excise from one-fourth of a cent to one and one-half cents per pound of raw coffee, some doubts arose as to the collection of this special tax regarding part of the 1938–39 crop which still remained without being sold, and the Treasurer of Puerto Rico was required to make an official interpretation of this question; that said officer issued circular letter No. 15, to which we have previously referred, in which he determined that the new excise would be collected in relation to the 1939–40 crop which had not yet begun to be harvested; that pursuant to this administrative interpretation "the cooperative included in the price of the coffee the one-fourth of a cent per pound

which it returned to the Treasurer of Puerto Rico upon making its liquidation to the growers"; that the Treasurer required the persons and entities who had in their possession coffee produced in the crops prior to 1939–40 to render a report as to the coffee they had in stock; that in connection with the coffee in possession of the cooperative of the 1938–39 crop and preceding years, a tax of one-fourth of a cent per pound was paid to the Treasurer; in relation to the 1939–40 crop the tax paid was one and one-half cents; that subsequently a new Treasurer required an additional payment of one and one-fourth cents on the coffee that the cooperative had in stock when Act No. 145 of 1939 went into effect, without considering the crop to which it belonged, "after having liquidated to the members all the crops that were subject to those excises"; that the cooperative acts as agent of the coffee growers, receives the coffee from them, "processes (*sic*) and sells it and returns to the members the value of that product after deducting the expenses had in its processing (*sic*) and handling"; that there is included among the expenses deducted the excise paid *"because it was included in the price in accordance with the Treasurer";* that the amount of the excise *"whichever it was" under the laws mentioned* was *"set"* on the coffee's market prices; "that the price prevailing at the time in the market already *included* the excise that *the purchaser had paid* and we [the cooperative] sold at those same prices and upon liquidating to the member we deducted the tax to be paid to the Treasurer"; that when the cooperative sold the coffee it did so for a price *which included the excise;* that this was an excise that *was paid* by the purchaser and in the long run by the consumers of Puerto Rico;[11] that if the original administrative interpretation had been different "we would have included the tax

---

[11] "Q. So this was an excise that was paid by the purchasers?

"A. Well . . . The purchasers paid it, in the long run it was paid by the consumers of Puerto Rico." (Tr. Ev., pp. 49–50.)

in the price''; that in 1942 when the demand for additional payment of tax was made it was impossible to collect it from the purchasers of the coffee on which the additional tax was levied; that it was the practice of the cooperative to sell the raw coffee *and include the tax in the price thereof;* that the tax was paid to the Treasurer after the sales were made; that although he is not sure he believes that the coffee of the 1938–39 and 1939–40 crops was sold at the same price because he does not remember the minimum prices fixed by the Commissioner of Agriculture;[12] that the minimum prices *included the excise;* that the amount of the excise ''was netted *(sic)* in the *price of the coffee to the purchaser'';* he repeated that ''when we sold that crop the excise was included therein'' and that ''the price at which we sold included the excise'' and that that price ''must have been more or less the same [to the price at which the other coffee growers sold the 1939–40 crop] because those are market matters''; that with respect to the 1939–40 crop ''everybody paid $1.50'';[13] as to 72,000 and odd pounds which were on deposit when Act No. 157 of 1940 went into effect, the excise at the rate of one-fourth of a cent per pound had already been paid in advance.

From the testimony summarized thus it does not appear that the taxpayer sustained the burden of the tax. At most, it shows that in the liquidation to the members of the cooperative the tax of one and one-half cents per pound was not deducted as one of the expenses incurred in disposing of the coffee produced in 1938–39, but only the tax of one-fourth

---

[12] Indeed, the minimum price for the sale of the 1938–39 coffee was $20 per hundredweight; and in 1939–40 it was also $20, that is, $18.50 as the minimum price fixed by the Commissioner for the grower, plus $1.50 of excise.

[13] On page 93 of the transcript of the testimony of witness Colón there is a statement made by him in the sense that ''all the coffee of the 1938–39 crop was sold without including the tax of one and one-half cents.'' That statement is not correct because the coffee was sold after that date, that is, in 1939–40, when the minimum price was $18.50 per hundredweight plus the excise of $1.50.

of a cent per pound. But this does not prove that plaintiff has sustained the burden of the tax. The competent proof to that effect had to establish that when the cooperative disposed of the coffee of 1938–39 by sale to the consumer it did not include the amount of the tax in the selling price. The only evidence on this point appears from the report of agent Víctor Fragoso dated November 21, 1941, and which was admitted in evidence as Exhibit D of the Secretary of the Treasury, which says: "The prices quoted by Cafeteros de Puerto Rico, Inc. to the consumer, which were always over $20, show that the tax was collected from the public." This statement was not contradicted with the only competent evidence therefor, that is, proof that the tax of $1.50 per hundredweight of coffee was not included in the selling price. It is well to remember that at the time the coffee was sold the minimum price fixed by the Secretary of Agriculture was $18.50 per hundredweight "plus the amount of the taxes in force on the coffee," which make a total of $20 per hundredweight. This minimum price of $20 is the same as that which prevailed prior to the enactment of Act No. 145 of May 11, 1939. As a matter of fact, if all the coffee of the 1938–39 crop has been sold prior to the effectiveness of Act No. 145 of 1939, at the minimum price fixed by the Secretary of Agriculture, the coffee grower would have received $19.75 per hundredweight, less expenses. But since part of that coffee was sold after the effectiveness of the above-cited Act, the liquidation to the grower was reduced to $18.50 per hundredweight, but that was due solely and exclusively to the fixing of a different minimum price for the sale of the product, that is, from $20 (including the excise of 25% per hundredweight) to $18.50, plus the tax.

Appellant refers in its brief to an alleged stipulation to which the parties agreed at the trial to the effect that if after the officers of the Treasury Department made the investigation in the books of the plaintiff no proof was found

that the excise had been transferred to another person, the right to the reimbursement claimed would be acknowledged. Apparently the distinguished counsel for plaintiff is mistaken on this point since from the transcript there only appears his own statement that the case would be submitted after the investigation of such documents as the Secretary wished to inspect had been accomplished.[14]

Since it has not been proved that the taxpayer sustained the burden of the tax, the respondent court did not err in dismissing the complaint and the judgment rendered by the latter on May 24, 1956, is hereby affirmed.

Mr. Justice Hernández Matos did not participate herein.

---

[14] The pertinent part of the transcript on pp. 42 and 43, reads:

"Mr. Arjona:   May it please the Court.   It being further understood, as it has been stipulated, that if these gentlemen go to Ponce and from the investigation they make of these documents, they do not find the points that they are alleging, the case shall be considered submitted."